UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

FOREST RIVER, INC.,

        Plaintiff,

   v.                                CAUSE NO. 3:21cv645 DRL

INTECH TRAILERS, INC.,

        Defendant.

<u>OPINION AND ORDER</u>

Earlier this year, after a five-day trial, a jury found that inTech Trailers, Inc. infringed Forest River, Inc.'s rights in its Della Terra and Mountain Design trademarks. The jury also found the violation willful and awarded Forest River $2 million to disgorge profits from the sale of goods bearing the infringing marks. Following the trial, the court granted Forest River's request for a permanent injunction against inTech. Today Forest River requests enhanced damages, attorney fees, prejudgment interest, and costs. inTech opposes these requests. The court analyzes each request in turn.

ENHANCED PROFIT AWARD

Forest River asks the court to enhance the jury's profit award. "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a). This provision is "properly invoked when, as in this case, the infringement is deliberate." *Gorenstein Enters. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989).

The law's primary aim is to ensure that trademark infringement is unprofitable. *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1349 (7th Cir. 1994). If a profit-seeking company is willing to pay ten cents for violating federal law so long as the business makes one dollar, then the law has not made

willful trademark infringement "sufficiently unprofitable." *Id.* at 1348. "[T]here is no upper limit on a discretionary increase in an award of profits." 5 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 30:90 (5th ed. 2024). The original award is fixed in equity, *see* 15 U.S.C. § 1117(a), and principles of equity dictate that a "wrongdoer should not be punished by pay[ing] more than a fair compensation to the person wronged," *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 80 (2020) (quotations omitted). That said, oft "a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts." *Id.*

At trial, inTech's chief financial officer testified that, in his reasonable estimation, his company had a net profit of approximately $5.56 million from its sales of Terra trailers [Tr. 879]. This accounted for any costs or deductions that could be legitimately applied. The jury awarded $2 million in disgorged profits—meaning inTech still pocketed over $3.56 million from its sale of trailers bearing the infringing marks. Forest River asks for enhanced damages no less than what even inTech, as the infringing company, said were its net profits, as articulated by its chief financial officer.

inTech presents several arguments against this—none compelling. First, inTech argues that Forest River suffered no actual damage, so the original profit award and permanent injunction are a sufficient deterrent. Forest River need not prove actual damages to disgorge profits. Actual damages serve as a separate basis for recovery. *See* 15 U.S.C. § 1117(a). The enhancement of damages to the infringer's admitted net profits helps to ensure the law's aim not to reward infringement, and not least willful infringement. This enhancement is nothing more than "compensation and not a penalty." 15 U.S.C. § 1117(a). If inTech is left to profit from its trademark infringement, Forest River hasn't been adequately compensated, and inTech inequitably has benefitted from its willful wrongdoing.

Second, inTech argues that $620,725.00 should not be added because that figure represents profits accrued after the trial was postponed from November 2023 to February 2024. This is a bit bold. Equity does not dictate that a briefly postponed trial (precipitated by a necessary participant's medical

condition) sanctioned inTech to continue its infringing sales before the hammer-stroke of the jury's verdict. inTech reasonably cooperated in securing a new trial date when the sudden medical issue arose the Sunday before trial. The company handled the issue equitably then, but not now.

Third, in two sentences, inTech argues that the profit figure should be reduced to the post-corporate income tax calculation, or $3,903,562.00. This tax deduction has no basis in law, at least none that inTech presents to the court, and the court rejects it accordingly as an undeveloped point. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012); *Gross v. Town of Cicero*, 619 F.3d 697, 704-05 (7th Cir. 2010). inTech also falls short of convincing the court that merely applying the "usual" corporate rate against profits would work as purely under GAAP principles as the company seems to hope.

Fourth, inTech argues that people purchase recreational vehicles for a host of reasons, including price, style, quality or relationships; from this, the company posits that its profits from Terra sales could be attributed in part to these other factors. For example, inTech highlights that Forest River's general manager testified that "brand is nothing without a good product" [Tr. 414]. In truth, inTech seems to seek some measure of apportionment, but at trial there was a "dearth of testimony altogether as to the issue of apportionment" [Tr. 964-65]. And "the burden of showing this is upon the poacher." *Mishawaka Rubber & Woolen Mfg. Co v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).

No evidence (expert or otherwise) was presented that a reasonably certain measure of inTech's profits originated from price, style, quality, or relationships rather than infringement—the sum reflecting that consumers would have purchased the product even without the infringing mark, or that their purchases naturally and probably resulted from other factors than the infringing mark. *See* 5 McCarthy § 30.65; *see also Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 646-47 (1915) (noting that reasonable approximation often comes from expert testimony). inTech offered no evidence as to the reasonable measure of profits to be deducted for these features of apportionment, and thereby would have invited the jury to guess. The court today would likewise need to guess.

inTech made the exercise of apportionment at trial impossible. "The difficulty lies in ascertaining what proportion of the profit is due to the trademark, and what to the intrinsic value of the commodity; and as this cannot be ascertained with any reasonable certainty, it is more consonant with reason and justice that the owner of the trademark should have the whole profit than that he should be deprived of any part of it by the [wrongful] act of the defendant." *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 262 (1916). Statements about what factors might drive sales will not allow inTech to introduce in the backdoor of its post-trial response what it never presented in the front door as evidence at trial of a reasonably certain deduction. Permitting this now would absolve inTech of its statutory burden at trial. And any doubt about a deduction from profits must be resolved in Forest River's favor. *See WMS Gaming, Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 607-08 (7th Cir. 2008); *see also Hamilton-Brown*, 240 U.S. at 262.

The jury was instructed that "[p]rofit is determined by deducting expenses from gross revenue" and that "[g]ross revenue is all of the money inTech received due to its use of the trademarks" [156 Instr. No. 7]. inTech's chief financial officer provided the calculation, and inTech offers no sound reason to disagree with its representative's testimony.

Fifth, inTech argues that the willfulness finding does not favor enhanced damages because the company had a reasonable belief that it was not committing trademark infringement. This argument perhaps reflects a mindset for why the jury found that inTech acted willfully, not least based on specific moments in which inTech moved ahead undeterred. *See infra* at 6-7. The jury firmly disagreed with the company's perspective. Willfulness on this record counsels enhanced damages. "[I]t is a principle long reflected in equity practice where district courts have often considered a defendant's mental state, among other factors, when exercising their discretion in choosing a fitting remedy. . . . [A] trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc. v. Fossil Group, Inc.*, 590 U.S. 212, 219 (2020).

The simple truth is that, on this record, equity should not permit inTech to pay $2 million to make another $3.56 million on the back of Forest River's trademarks. The law's aim to ensure that infringement remains unprofitable would be undone were an infringing company—and one willfully infringing at that—permitted to withhold, rather than disgorge, a vast majority (64 percent) of the net profits made from its wrongdoing. *See WMS Gaming*, 542 F.3d at 608. By any measure on this record, that isn't equitable.

The trial record contains plain evidence of inTech's sales, as well as any elements of cost or deduction reasonably claimed. *See* 15 U.S.C. § 1117(a). inTech presented its own chief financial officer to testify to these points. In the end, it proves inescapable in equity not to award the measure of net profit that even the infringing company admits it earned, and because of its willful infringement that the jury found. The court thus enhances the profit award from $2,000,000.00 to $5,561,943.00.

## ATTORNEY FEES

Though attorney fees are generally unrecoverable, Rule 54 allows the recovery of attorney fees through the applicable statutory authority. Fed. R. Civ. P. 54(d)(2)(B)(ii). Forest River requests attorney fees under 15 U.S.C. § 1117(a). In a trademark infringement case, the court "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. 1117(a). The purpose of such an award is "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." *Automated Bus. Cos. v. NEC Am., Inc.*, 202 F.3d 1353, 1355 (Fed. Cir. 2000); *see also LHO Chi. River, LLC v. Perillo*, 942 F.3d 384, 388 (7th Cir. 2019).

The court considers the "totality of the circumstances" to determine whether a case is "exceptional." *LHO*, 942 F.3d at 386. An exceptional case means one "where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1158 (7th Cir. 1994); *see also Door Sys. v. Pro-Line Door Sys.*, 126 F.3d 1028, 1031 (7th Cir. 1997) ("canonical formula in this and other circuits"). For example, a business "might copy another's trademark

believing in good faith that it was privileged to do so," and it would still "be acting deliberately, and so could be ordered, in the discretion of the district court, to pay the other party's attorney[] fees." *Door Sys.*, 126 F.3d at 1031.

Forest River must prove its entitlement to fees by a preponderance of the evidence. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557-58 (2014). The court considers the substantive strength of each side's position and the manner in which the case was litigated, though a showing of bad faith is not required. *Id.* at 554-55. Other factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6.

At the outset, inTech cites certain extra-jurisdictional cases to show that something more than willfulness is required to award attorney fees. *See, e.g., Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 81 (1st Cir. 2008); *Anhing Corp. v. Thuan Phong Co.*, 2016 U.S. Dist. LEXIS 195309, 8-9 (C.D. Cal. Jan. 25, 2016). But the law here treats willful infringement as exceptional and does not require more. *See Badger*, 13 F.3d at 1158-59. The court nevertheless considers other factors to underscore that this case indeed was an exceptional case.

It turns out that Forest River was not the only one who cared about brands—the jury did too. A jury found that inTech's trademark infringement was willful. Reviewing key facts perhaps reveals why. At trial, inTech owner Scott Tuttle testified that he was aware of Forest River's Della Terra line when it launched in 2018 [Tr. 834-36]. That fall, inTech's sales manager and president received emails advertising the trailer [Tr. 328, 377; Ex. 48-49]. There was no mystery that Forest River had launched this new line in 2018. In 2020, Sharpline—as it turns out the graphic supplier for both inTech and Forest River—created inTech's "Terra" mark and mountain design [Ex. 22, 46, 90, 92, 144]. inTech also sub-branded a Terra trailer "Oasis"—another Forest River brand [Ex. 24].

On December 4, 2020, Forest River sent inTech a cease-and-desist letter [Ex. 47]. The letter called for inTech to cease its use of Terra, Oasis, and the mountain design. inTech agreed to quit using Oasis, making the decision because, in its sales manager's words, "it will help our cause if the judge sees we gave Oasis" [Ex. 189; Tr. 357, 429]. Despite a warning from counsel, the company's owner plowed ahead with Terra and the mountain design because "whether an attorney says yay, nay, or anything in between would not affect [inTech's] opinion" [Tr. 854-55]. And as the sales manager put it again in March 2021, "we are telling [Forest River] to screw off and take us to court over Terra" [Ex. 189]. So, to court the company went, willful in its plan and having made the choice to continue—a choice made before the company ever shipped a single Terra unit [Tr. 432-35].

At times during the ensuing litigation, inTech presented poor arguments. *See Gorenstein*, 874 F.2d at 436-37. For instance, inTech tried to create an assumption-of-the-risk affirmative defense that has no basis in law and was exorcised at summary judgment. At the United States Patent and Trademark Office, inTech opposed Forest River's Della Terra registration, claiming Terra had priority [69-3 at 106-108]. This argument was replicated at summary judgment, based only on a poster arguably shown at a 2017 trade show—a poster that didn't see the light of day again until this lawsuit [Tr. 792-93; inTech Dem. Ex. 1], despite the owner's attempts to drum up more evidence. The court disposed of the priority argument at summary judgment. inTech argues that the court gave it license to argue that Forest River assumed the risk after inTech displayed the poster in 2017, but the court's summary judgment ruling does no such thing [114 at 26].

Today inTech rewrites a bit of history to say it never argued that it was the first user—an odd position today when in fact it did, and perhaps again just serves to illustrate the court's point here [*see, e.g.,* 78 at 2, 7, 22 ("Between the parties to this lawsuit, inTech was the first to announce to the public a TERRA travel trailer brand, at the Elkhart Open House trade show back in September, 2017") ("[I]f the defendant was the first user of the accused trademark, the defendant's use cannot have caused the

likelihood of consumer confusion") ("inTech was the senior user of both the word TERRA and the font used for that mark")]. It made the argument based on a mere token display of a single poster at a trade show in 2017—by definition, an anemic position without a vendible product in the market.

Despite notice from Forest River and the court's summary judgment ruling that inTech had no priority, inTech persisted in trademark infringement. In fairness, the court left to the jury the factual question of the likelihood of confusion. inTech's marketing manager (Wesley Kowal) testified that implementing negative ad words to restrict Della Terra Google searches from showing Terra ads was a cost-free measure he could not recall inTech taking [Tr. 302-03, 356, 384-85]. inTech knew that customers were searching for Della Terra only to see Terra ads [Ex. 19 at 9]. It wasn't until after the verdict that inTech implemented the ad words [*see* 162 at 7 (citing 162-7 at 3)].

inTech also argues that this wasn't an exceptional case because it survived summary judgment. Survived maybe is the best word, as inTech had no priority and the issue of likelihood of confusion went to the jury because the evidence wasn't "so one-sided that there can be no doubt about how the question should be answered." Contrary to inTech's assertion today, the court did not conclude that two of the three primary confusion factors favored inTech. Instead, the court held that they "could swing inTech's way"—based on a standard that required the court to take all reasonable inferences in inTech's favor in reaching its ruling. Contesting summary judgment on this front wasn't unreasonable; but surviving summary judgment doesn't mean this wasn't an exceptional case, not least given the jury's ultimate finding of willfulness. *See, e.g., Mueller Sports Med., Inc. v. Sportstar Ath., Inc.*, 2005 U.S. Dist. LEXIS 26883, 3 (W.D. Wis. Nov. 2, 2005).

Still other flimsy positions emerged during litigation. inTech required the court to order electronic discovery by a third-party. inTech asserted that it could not calculate net profits on its Terra units in response to a discovery request [174-4 PDF 96-97], though inTech was able to crunch the numbers for trial after Forest River's damages expert did the math [Tr. 886]. After the verdict, inTech opposed a

permanent injunction—a usual remedy for trademark infringement—and treated that issue more as negotiation than acquiescence to the jury's willfulness finding. To be fair, inTech reported already taking certain steps to eliminate use of the Terra and mountain design within the week, but that undoubtedly means that inTech had prophylactic measures in place if in fact its gamble to give up Oasis and defend Terra turned out to be the wrong call before the jury. Businesses make decisions based on their risk assessment all the time, and smart ones have contingency plans too, but this struck as inTech once more hedging its bet as it had done before the litigation.

inTech argues that it has already been sufficiently deterred and Forest River sufficiently compensated through the jury's profit award (now enhanced) and the court's permanent injunction. But this case is exceptional by virtue of inTech's willful infringement, coupled then with other positions taken during the litigation. Fees are warranted. The only question is their reasonableness.

Before getting there, the court addresses Forest River's supplemental request for fees incurred in preparing its fee petition and in obtaining inTech's compliance with the permanent injunction. "[A]n allowance of reasonable fees for presenting a successful fee petition is the only way a fee applicant can be made whole." *Bretford Mfg. v. Smith Sys. Mfg. Co.*, 421 F. Supp.2d 1117, 1128 (N.D. Ill. 2006).

inTech argues that this supplemental request does not comply with the 14-day deadline to file a fee petition post-judgment. *See* Fed. R. Civ. P. 54(d)(2)(B)(i). To be sure, opening fee petitions can and should include fees from the preparation of the fee petition, affidavits, and briefing for them. Firms and lawyers are accustomed to tracking their billings on a daily basis, and these can be easily closed or finalized as a final add-on before filing. But when the other side opposes the petition with a 25-page brief, this will often invite a supplemental request—at minimum for the reply that could not be written yet. And pragmatically, it makes little sense to oppose the mere timing of the supplemental request for two reasons: should litigants not settle the fee amount as they ideally should, the court may adjust the time period for filing a petition, *see* Fed. R. Civ. P. 54(d)(2)(B), and often the court will do so to accommodate the fees

incurred to secure a reasonably full recovery. *See, e.g., Nexus Staffing, Inc. v. Nexus Emp. Sols. Plus of Ind., Inc.*, 2022 U.S. Dist. LEXIS 246397, 23 (N.D. Ind. Aug. 24, 2022); *Wyatt v. Five Star Tech. Sols., LLC*, 2021 U.S. Dist. LEXIS 69449, 10 n.4 (S.D. Ind. Mar. 23, 2021). Part of ensuring that fee petitions don't become a "second major litigation" is addressing any supplemental request with common sense and a fair dose of efficiency. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The court thus will award reasonable fees incurred to secure the recovery today.

Forest River also requests that the court award fees for its ongoing efforts to ensure compliance with the court's preliminary injunction. This the court won't do. Forest River cites *Honorable Ord. of Ky. Colonels, Inc. v. Ky. Colonels Int'l*, 2023 U.S. Dist. LEXIS 138718, 17 (W.D. Ky. Aug. 9, 2023), but there the attorney fees resulted from an injunction violation that precipitated an evidentiary contempt hearing— an actual legal proceeding before the court. *Experience Hendrix, LLC v. Hendrix*, 2021 U.S. Dist. LEXIS 4876, 27-28 (S.D.N.Y. Jan. 11, 2021), similarly awarded attorney fees from contempt proceedings; as did Forest River's other authority, *HomeVestors of Am., Inc. v. Toliver*, 2023 U.S. Dist. LEXIS 7068, 14-15 (D.D.C. Jan. 13, 2023). Forest River has not presented the court with authority for awarding fees from its business decision, outside enforcement or other court proceedings, to monitor a competitor extraneously. The Lanham Act speaks in terms of a "prevailing party," 15 U.S.C. § 1117(a), with the purpose of compensating that party for its expenses "in the prosecution or defense of the suit," *Automated Bus. Cos.*, 202 F.3d at 1355. The circumstances might be different if inTech's conduct triggered the need for a contempt or other enforcement proceeding, but that isn't today's case.

The court thus turns to whether Forest River's attorney fees are reasonable. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433; *see Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). The "most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quotations omitted).

"If the bills were paid, this strongly implies that they meet market standards." *Medcom Holding Co. v. Baxter Travenol Lab'ys, Inc.*, 200 F.3d 518, 520 (7th Cir. 1999).

When calculating a reasonable hourly rate, the court looks to the lodestar. *Perdue v. Kenny A.,* 559 U.S. 542, 546 (2010); *see also Bankston v. Illinois*, 60 F.3d 1249, 1255 (7th Cir. 1995). The lodestar originates from "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). "Market rate" is "the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." *McNabola v. Chi. Transit Auth.,* 10 F.3d 501, 519 (7th Cir. 1993). An "attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996) (citation omitted). Rates from other lawyers in the community of "reasonably comparable skill, experience, and reputation" provide the "next best evidence." *Id.* (citations omitted).

The party seeking fees bears the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (quoting *Blum*, 465 U.S. at 895 n.11). If Forest River satisfies its burden, then the burden shifts to inTech "to offer evidence that sets forth a good reason why a lower rate is essential." *Id.* (citation and quotations omitted). If Forest River doesn't satisfy its burden, the court "has the authority to make its own determination of a reasonable rate." *Id.*; *see also Smith v. Nexus RVSA, LLC*, 572 F. Supp.3d 550, 558 (N.D. Ind. 2021).

Forest River requests $1,260,249.99 in attorney fees across 2,550 attorney hours—a blended[1] hourly rate of $494.22 per hour.[2] Partners billed 1265.7 hours at an effective rate of $595.14 per hour,

---

[1] Primary counsel billed as follows, including Philip R. Bautista at rates of $525 (2021, 2022), $650 (2023), $685 (2024) [174-2 ¶ 8]; Tracy Betz at rates of $500 (2021), $550 (2022), $600 (2023), $645 (2024) [174-3 ¶ 10]; and JoZeff W. Gebolys at rates of $365 (2021), $405 (2022), $440 (2023), $475(2024) [174-4 ¶ 3].

[2] Michael Hays, an experienced trial attorney, well-known to the court, who offers an independent affidavit to support the fee petition, points out that the blended rate before trial would be lower, roughly $469 per hour [174-1 ¶ 10].

associates billed 1237.2 hours at a rate of $397.78 per hour, and other staff (including paralegals, but not limited to paralegals) billed 47.1 hours at a rate of $315.55 per hour [174-4 ¶ 12]. Forest River's counsel reduced the amount billed to Forest River [174-1 ¶ 14].

Forest River paid all fees incurred through January 2024 for a total of $1,036,927 [174-4 ¶ 10]. inTech contests this, saying there isn't evidence of payment—another point not worthy of debate when sworn affidavits suffice and when inTech only speculates that this might be wrong. The case included extensive discovery, discovery disputes, sixteen depositions, two motions to exclude Rule 702 witnesses, two motions for summary judgment, and a five-day trial. In the range of all trials, it was more sophisticated than some; and in the range of trademark cases, it necessarily required heavy lifting.

On the first factor, Forest River was notably successful in this case, earning a jury verdict on trademark infringement and willfulness, as well as a profit award. *See Farrar*, 506 U.S. at 114. Second, Forest River attaches the affidavit of an experienced commercial litigator, Michael Hays, who says, based on "the complexity of the issues, the breadth of discovery, and the nature of the pre-trial motion practice," the number of hours expended by Forest River's counsel were reasonable [174-1 ¶ 12]. In response, inTech cites a report from the American Intellectual Property Law Association (AIPLA) showing that the average cost of trademark infringement litigation in the $1-10 million range is $792,000 for "other central communities" [180 at 15]. But, as Forest River points out in reply, it sought over $12 million in damages, arguably bumping it up to the next category of $10-25 million, where the average cost is $1,703,000 [182-1 at 64]. This is significantly more than Forest River requests. And even if Forest River overshot in damages, such that this case might fall between these two datapoints, the company's fee request likewise falls between the two.

As to the rate per hour, Forest River notes that the attorneys billed at or often below their standard rates throughout the case [174-4 ¶ 16]. *See People Who Care*, 90 F.3d at 1310. Experienced counsel notes that Forest River's counsel was "diligent in assigning work to the lowest-cost timekeeper suitable

for the work" [174-1 ¶ 10]. The court will address the number of billers in a moment, but the court's overall review reveals there was concerted effort to downstream work for cost-efficiency.

inTech offers several objections to Forest River's fees. First, inTech objects to the court awarding any fees resulting from the delay in the trial, particularly since Forest River's rates increased in 2024 between the initial date for the trial and the trial in February. An unavoidable medical condition caused the delay in trial, not any of the parties. The court will not withhold fees because of an unfortunate bout with illness that neither the parties nor the court could have expected or avoided. These are the risks inherent in litigation—that willful infringement may first spark litigation, that the dynamics of litigation from willful infringement may then necessitate the devotion of attorney time over one or two years (or more) during which fees and rates will understandably increase, and that the human endeavor that works hard to perform the tasks of litigation may succumb to medical needs during that time.

Second, inTech accuses Forest River of padding its hours—pointing to Mr. Bautista increasing his original time to a revised amount on 17 occasions. There is no real need for revision, and parties should present business records as they have been regularly maintained. That said, Forest River outlines how it specifically tried to avoid duplication, with Mr. Gebolys and Mr. Bautista not attending the other's depositions and associates doing all the work that could be assigned to them [174-4 ¶ 19]. Forest River also notes that it split witnesses between trial counsel to avoid duplication [*id.* ¶ 20]. The signed affidavit of local counsel supports this [174-1 ¶ 10]. Forest River clarifies that Mr. Bautista's revised hour logs simply condensed multiple time entries for each task for billing to avoid overly long entries [182 at 11 (confirmed in an affidavit from Taft Billing Partner 182-3 ¶¶ 3-4)]. inTech gives the court no reason to doubt this, so the court sees no reason to reduce the fees for this reason.

Third, inTech objects to inclusion of time charged to other lawsuits and legal proceedings, like the Motorists and TTAB cases [180 at 17]. It notes that in Entries 370, 416, 477, 478, 498, 527, 550, 567, 568, 569, 571, 799, 1109, 1116, 1117, 1120, 1121, and 1141, as well as Forest River's block billing style

make it impossible to tell which work was for another case [*id.* (citing 174-4)]. Therefore, inTech argues, all the time entries should be excluded, for a discount of $11,587.00 [*id.*]. Forest River responds that these hours related to this case because the other proceedings were (1) the related case filed by inTech's insurance carrier against inTech and Forest River and (2) the opposition proceedings inTech started against the registration of the DELLA TERRA trademark. These proceedings, Forest River asserts, "would not have been incurred if not for inTech's infringement and this lawsuit" [182 at 12]. Nevertheless, these hours were for separate proceedings, and these fees will not be included. *See Bryant v. City of Chi.,* 200 F.3d 1092, 1101 (7th Cir. 2000) (directing court to treat unrelated claims as if they had been raised in "separate lawsuits" and not award fees). The court discounts $11,587.00 from the total.

Fourth, inTech objects to the work of 23 lawyers and timekeepers in the case, arguing that the work and nature of the case didn't warrant so many people. It highlights the $47,852.00 charged for the remaining 16 timekeepers [174-4 ¶ 14] and says this time should be deducted. Forest River names seven key timekeepers—by last name, Gebolys, Bautista, Betz, Peluchette (associate-IP group), Kortokrax (associate), Pfister (associate-IP group), and Stevenson (associate)—but it leaves 126.8 hours (and $47,852.00) to a category called "Remaining 16 Timekeepers Combined" [*id.*]. This group represents a combination of associates, paralegals, and two individuals titled "litigation support" [*id.* ¶ 15]. inTech doesn't claim that the time was duplicative; it merely says "redundant work and 'learning curve' charges are inevitable" without explaining further or pointing to any evidence.

The court will not include litigation support from staff as "attorney fees." And, in fairness, the total number of billers (23) is unusually high. The court won't scour 90 pages of billing records to try to determine the hourly rates of the "other" 16 timekeepers, or the reasons why their rates might be reasonable based on their training and experience. Such information is omitted from Forest River's primary supporting affidavit, which gives merely an effective blended rate, albeit across several classes of billers—partners, associates, paralegals, and litigation support. This is of some fair concern when certain

associates were tasked with billing research on what experienced trial lawyers, and certainly those here, should already know—for instance, whether someone's credibility creates a genuine triable issue at summary judgment or whether attorney argument constitutes evidence. The court applauds efficiency in preparing fee petitions, but the court finds some cause to discount the fees for this class of 16 billers (except for primary paralegals) when this petition falls short of its burden of explaining the reasonableness of their rates or the need for this number to add to seven primary billers. The court reduces the $47,852.00 for this category to $28,711.00.

Forest River incurred $74,041.25 (170.1 hours) at a blended rate of $435.28 to litigate this fee petition. The court appreciates that the company responded full-throatedly to the 25-page brief that inTech filed to oppose this petition, but its broad petition invited some aspects of this. By most measures, on its face a $74,000 "fees on fees" request is steep. It would not be uncommon for busy lawyers to average 170 hours in a month (annualizing over 2,000 hours), and many contested fee petitions will not likely require a whole month of a lawyer's time. Certain trials can be accomplished within this figure, whole appeals as well, and fee petitions should not become a second trial or the equivalent of an appeal. *See Hensley*, 461 U.S. at 437. That said, this fee petition was more unique than some, and Forest River pursued enhanced damages (successfully), fees, costs, and prejudgment interest, with both internal affidavits and business records as well as independent affidavits, including one from the company's Rule 702 witness on interest. And there are, among other fair arguments, some poorer, and some nits too of inTech's own making that increased this cost in substantive briefing, so for purposes of this unique case the court reduces this portion of fees modestly to $55,495.00.

Accordingly, the court awards attorney fees to Forest River in the total amount of $1,285,016.99.

PREJUDGMENT INTEREST

Forest River seeks prejudgment interest on the profit award through the date of judgment. Federal trademark law allows prejudgment interest for the intentional use of a counterfeit mark, *see* 15

15

U.S.C. § 1117(b), but it does not provide for an award of prejudgment interest for traditional trademark infringement. Typically, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

That said, "prejudgment interest should be presumptively available to victims of federal law violations." *Gorenstein*, 874 F.2d at 436; *accord RK Co. v. See*, 622 F.3d 846, 853 (7th Cir. 2010) (noting it is "well established in this circuit"). Courts have subsequently applied that rule broadly in cases where a party has willfully violated federal law. *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 572 (7th Cir. 2003) (listing cases). Prejudgment interest puts the trademark infringer "in the same position as if he had not received any ill-got gains." *SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009). It "corrects judgments for the time value of money." *Pickett*, 813 F.3d at 646.

inTech argues that Forest River doesn't need prejudgment interest to make it whole again, but courts have awarded prejudgment interests on disgorgement of profit awards in trademark cases to prevent unjust enrichment, in addition to fully compensating the victim. *See, e.g., Dyson, Inc. v. SharkNinja Operating LLC*, 2019 U.S. Dist. LEXIS 56028, 69-70 (N.D. Ill. Mar. 31, 2019); *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2005 U.S. Dist. LEXIS 3069, 5-6 (N.D. Ill. Feb. 8, 2005). The case inTech cites, *In re Marshall*, 970 F.2d 383, 385 (7th Cir. 1992), doesn't counter this. It is distinguishable because the defendant there was explicitly not unjustly enriched, unlike inTech here. *Id.* A jury found that inTech willfully violated federal law. Withholding prejudgment interest would essentially permit inTech to retain money (or money it could have made through investment) it didn't earn.

Prejudgment interest is warranted here. At the enhanced award of $5,561,943.00, Stephen Holzen calculates that Forest River is entitled to $244,623.00 in prejudgment interest. Without reason to dispute this amount, the court awards Forest River $244,623.00 in prejudgment interest.

COSTS

A. *Taxable Costs.*

Forest River asks for $72,227.36 in taxable costs. The federal rules authorize an award of costs to the prevailing party. *See* Fed. R. Civ. P. 54(d)(1). "Cost" is a term of art. For instance, costs don't include attorney fees, including local counsel fees, *see Pigeaud v. McLaren*, 699 F.2d 401, 403 (7th Cir. 1983), or electronic research fees, *see Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121, 1130 (7th Cir. 2023). The court cannot award costs beyond what the statutes authorize. *See* 28 U.S.C. §§ 1821, 1920; *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-43 (1987); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 481 F.3d 442, 447 (7th Cir. 2007). Forest River must establish its costs were necessary and reasonable, *U.S. Neurosurgical, Inc. v. City of Chi.*, 572 F.3d 325, 333 (7th Cir. 2009), though it need only "provide the best breakdown [of its costs] obtainable from retained records," *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991).

inTech objects to $30,976.93, specifically related to deposition transcript costs ($13,266.15), trial real-time feed costs ($7,106.40), copies of trial exhibits ($9,789.84), and costs incurred because of the medical delay ($814.54). The court starts with the transcripts. Forest River seeks $47,395.72 in fees for printed or electronically recorded transcripts necessary for the case. This includes $35,841.08 for deposition transcripts and videographer fees, $284.00 for the final pretrial conference transcript, and $11,270.64 for the trial transcripts [173-1 ¶ 5].

Courts may award costs for deposition transcripts, so long as they are reasonably necessary in the case. *See Harney v. City of Chi.*, 702 F.3d 916, 927 (7th Cir. 2012). inTech first objects to the court assessing the costs for both deposition transcripts and videotapes. inTech cites older cases holding that a party cannot recover costs for videotapes and deposition transcripts [178 at 7 (citing *Moore v. University of Notre Dame*, 22 F.Supp. 2d 896, 915 (N.D. Ind. 1998)]. But Forest River points to more recent case law allowing the recovery of both costs, so long as both are necessary to the litigation. *Little v. Mitsubishi Motors N. Am.,*

*Inc.*, 514 F.3d 699, 702 (7th Cir. 2008). Here Forest River notes that it obtained video deposition tapes to protect its case should issues arise with the pandemic or witness availability. That was "reasonably necessary" at the time. *See Downing v. Abbott Labs*, 2023 U.S. App. LEXIS 25136, 5 (7th Cir. Sept. 22, 2023). Whether otherwise necessary to present testimony effectively through video at trial or for impeachment the court need not decide today.

Second, inTech objects to the rough drafts of deposition transcripts and litigation package costs. It claims that these were merely for counsel's convenience and not necessary for the case. *See Moore*, 22 F. Supp.2d at 914. Forest River counters that, to have adequate time to prepare for depositions in quick succession, rough drafts were necessary, and in fact, cheaper than paying for expedited delivery (which in some cases it says would not have been fast enough). *See Keia v. City of Chi.*, 2021 U.S. Dist. LEXIS 245223, 6 (N.D. Ill. Dec. 22, 2021). Forest River says the litigation package included PDFs of transcripts so the lawyers could search the documents and provide the court with the necessary highlighted pretrial filing requirements. Counsel, and teams of counsel, not infrequently take depositions in quick succession. Sometimes this is of their own making in managing busy schedules. Most often it is a matter of mere convenience. Indeed, rough drafts cannot be used for anything official. Lawyers who listen as witnesses give testimony know what has been said; and lawyers who team with others can easily share salient points from one deposition to aid his or her colleague in taking or defending the next one. Because rough drafts are for convenience rather than necessity, the court excludes these costs of $2,573.00.

Third, inTech objects to Forest River's trial transcript cost of $11,270.64. inTech does not object to the daily transcripts of trial testimony, only the $7,106.40 spent on three Realtime connections during trial. inTech says these connections were particularly unnecessary given the three Forest River attorneys in the courtroom and the daily transcripts. Forest River claims that the Realtime connections allowed the lawyers to excuse themselves to prepare for other parts of the trial by keeping up with the testimony

being given. inTech points out in reply, correctly, that this could have been done with the daily transcripts. Realtime is a convenience, not a necessity. The court thus excludes the $7,106.40 in Realtime expense.

Fourth, inTech objects to the costs of the Zimmerman deposition ($228.15), which it says occurred in a different lawsuit, *Motorists Commercial Mutual Insurance Company v. inTech Trailers*, noting that Mr. Zimmerman was not a witness in this case and claiming his deposition wasn't used in this lawsuit. Forest River explains that it is a related case in this same district filed by inTech's insurer and argues that it needed to obtain this testimony to see if any testimony related to this lawsuit. As inTech points out, Forest River was dismissed from that lawsuit in March 2022, months before Mr. Zimmerman's September 2022 deposition. 28 U.S.C. § 1920 allows for costs for transcripts "necessarily obtained for use in this case." Whether the deposition was necessary for the other case, nothing on this record shows it was necessary for this one. The court excludes this cost.

Fifth, inTech objects to what it calls "excessive copying." Forest River seeks $23,439.51 in fees for exemplification and copying that it says were necessary ($22,842.97 for seven copies of all the trial exhibits and $596.54 for supplemental exhibit copies) [173 at 1, 173-1 ¶ 6]. Forest River claims it needed seven copies—two copies for the defense, three copies for Forest River "for its own purposes," and two for the court in accordance with the pretrial order [173-1 ¶ 7]. inTech says this amount should be reduced by $9,789.84 (or 3/7) because only four copies were justified. Forest River cites *Habdas v. City of Chi.*, 2004 U.S. Dist. LEXIS 2705, 4 (N.D. Ill. Feb. 23, 2004), for the proposition that extra copies are permissible in case the exhibits need to be published to the jury. That case does allow extra copies, but counsel there spent less than $1,300.00 on exhibit copies. *Id.* at 3. And exhibits are commonly published, and were published here during trial, by use of the court's presentation system. In addition to electronically stored and presented exhibits, there only would be fair cause to have a hard copy for each side, as well as the two copies for the court (for bench and jury). The court thus reduces this cost by 3/7

to $13,053.13. *See Moore*, 22 F. Supp.2d at 914 ("While it may be convenient, additional sets of every document are excessive.").

Sixth, inTech argues that the court should deduct the $814.54 that resulted from the medical delay. The court declines. The court thus awards $51,933.43 in taxable costs.

B.  *Nontaxable Costs.*

Forest River acknowledges that the $49,976.47 in "other costs" listed on the bill of costs are nontaxable under 28 U.S.C. § 1920, but it contends that they should be awarded under 15 U.S.C. § 1117(a). inTech claims that these costs, including travel and trial technology, are not within the court's discretion to allow because they aren't included in 28 U.S.C. § 1920.

When a federal statute refers simply to "costs," courts "are limited to awarding the costs specified in §§ 1821 and 1920." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 339 (2019). Without "express authority" in the statute's text, the court "may not award litigation expenses" not included in these statutes. *Id.* Costs are not attorney fees. Under these statutes, the court may award witness fees, but not attorney travel and lodging. *See Calderon v. Witvoet*, 112 F.3d 275, 276 (7th Cir. 1997); *Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 217 (7th Cir. 1975). The court cannot award expert witness fees, unless court appointed or (for purposes here) within the narrow confines of §§ 1821 or 1920. *See Crawford Fitting*, 482 U.S. at 442; *Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.*, 801 F.2d 908, 910-11 (7th Cir. 1986).

Forest River relies on 15 U.S.C. § 1117(a), which allows courts to award "the costs of the action." Unlike some federal statutes, the Lanham Act makes the award of costs "subject to the principles of equity," 15 U.S.C. § 1117(a), though neither side addresses this language or why this qualifies as an "explicit statutory instruction" to award nontaxable costs of the ilk here, *Rimini*, 586 U.S. at 340; *see also Alfwear, Inc. v. Mast-Jaegermeister United States, Inc.*, 2023 U.S. App. LEXIS 31361, 13-14 (10th Cir. Nov. 28, 2023) (nontaxable costs not awardable under the Lanham Act). It doesn't strike as one. Accordingly, the court denies the award of nontaxable costs.

CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART Forest River's motion for enhanced damages, attorney fees, prejudgment interests, and costs [174], and GRANTS IN PART and DENIES IN PART inTech's motion to amend the costs taxed [178]. The court DIRECTS the clerk to enter an amended judgment awarding Forest River $5,561,943.00 in disgorged profits, $244,623.00 in prejudgment interest, $1,285,016.99 in attorney fees, and $51,933.43 in costs, with post-judgment interest to accrue in accordance with law.

SO ORDERED.

September 19, 2024                                   s/ Damon R. Leichty
                                                    Judge, United States District Court